# Establishment of the President's Council for International Youth Exchange

Proposed establishment of the President's Council on International Youth Exchange (Council) within the United States Information Agency (USIA), for the purpose of soliciting funds from the private sector for the USIA's youth exchange programs, is generally permissible, although the Council's activities would be subject to certain limitations and its continued operation after a year would depend upon a specific congressional appropriation.

Under the Fulbright-Hays Act, employees of the USIA are permitted actively to solicit private contributions to support the USIA's exchange programs. However, under 5 U.S.C. § 3107, any publicity in this connection would have to be carefully tailored to further only the USIA's fundraising activities and not generally to aggrandize the USIA or its officials, in accordance with guidelines of the General Accounting Office.

Under 31 U.S.C. § 673, creation of the Council must be "authorized by law" in order for public funds to be used for its expenses or for USIA employees to assist in its operation. While § 673 does not require specific statutory authorization for the establishment of government councils and commissions, it does require that such entities and their functions be authorized "in a general way" by law. Whether the Council meets this test may depend upon its size and functions.

Under the Russell Amendment, 31 U.S.C. § 696, non-statutory councils and commissions which are vested with authority to take substantive action on the government's behalf must receive specific budgetary support from Congress within a year of their establishment in order to continue operating beyond that date.

The functions of the proposed Council in connection with fundraising and advising activities, as well as its proposed relationship with the USIA, would be such as to require that its members be made employees of the federal government.

September 16, 1982

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, UNITED STATES INFORMATION AGENCY

This memorandum responds to your request for our comments regarding the establishment of a new government council within the United States Information Agency (USIA). You and other officials of the USIA have outlined in several letters and meetings the proposed structure and functions of the council, which would be named the "President's Council for International Youth Exchange" (Council). As presently planned, the Council would be composed of approximately 300 private citizens who would solicit contributions from the private sector for the USIA and submit an advisory report to the President and to the

541

Director of the USIA (Director) outlining ways for the USIA to increase private contributions to the USIA.

For the reasons outlined in detail in this memorandum, we conclude that most of the proposed activities of the Council that you have described are generally authorized by law. We caution, however, that there are certain legal restrictions that may affect the operations of the Council. These are discussed in more detail below. In our view, moreover, the USIA will be required to obtain specific congressional appropriations for the proposed Council within a year of its creation for it to continue to operate beyond that date. In light of these potential difficulties, the USIA may wish to consider seeking legislation authorizing the proposed Council before its creation, rather than rely on existing statutory authority to establish the Council. Securing such explicit congressional authorization would avoid the possibility that Congress may substantially reorganize the Council, or even abolish it, after a year, resulting in a substantial loss of time and effort by members of the Council and the USIA. The decision whether to seek such prior authorization obviously involves an exercise of judgment that you and other officials of the USIA are best equipped to make. We defer to your sound discretion in this matter, and simply raise the issue for your consideration.

## I. Background

Because the proposed size and functions of the Council have changed significantly over the past three months, it is appropriate to review the history of this proposal and to outline the current plan for the Council. This Office initially reviewed and expressed no objection to suggested language for a presidential speech announcing the establishment of the Council. According to this language, which was ultimately included in the President's announcement of May 24, 1982,[1] the Council was to be a federal advisory committee organized to advise the President and the Director about ways to increase private contributions to the USIA for its newly planned programs on International Youth Exchange (Youth Exchange Programs). *See* Federal Advisory Committee Act, 5 U.S.C. App. I (FACA) (authorizing establishment of advisory committees to the President and heads of agencies). The Youth Exchange Programs seek to stimulate awareness and appreciation of American society among European youth by subsidizing and generally encouraging private efforts to bring European youths to the United States for study or for work.

Subsequent to the President's speech, we were advised that the proposed functions of the Council had been expanded so that its members would also solicit contributions to the USIA for its Youth Exchange Programs, in addition to advising the President and Director on ways to increase such contributions. This

---

[1] In announcing the establishment of the Council, the President stated that "I plan to form a Presidential Committee to advise me and to help Charlie Wick [the Director of the USIA], who is my personal representative for this effort, [to] help [him] find ways to stimulate greater private involvement across the country." Remarks of President Ronald Reagan, White House Meeting on International Youth Exchanges, White House (May 24, 1982) at 2.

revision contemplated a Council composed of approximately 50 prominent representatives of corporations, foundations, and educational institutions serving in both an advisory and operational capacity. The solicitation of contributions, as we understood at the time, was to be accomplished by members of the Council making telephone calls and individually contacting persons in the private sector to contribute to the Youth Exchange Programs. Because of the members' operational duties, they were to be appointed by the Director as part-time employees of the USIA. The members, however, were not to receive any salary from the government for their activities, although they would have received reimbursement for their expenses.

More recently, the scope of the Council's proposed operational efforts has been significantly expanded, and the responsibilities within the Council have been divided. Under the latest proposal, as we understand it, the Council would be composed of approximately 300 major corporate leaders, who would be divided into two groups—"directors" and "members." The "directors," who would number about 30, would oversee the operations of the Council through their service on three committees—an Executive Committee, a Public Relations Committee, and a Program Committee. Although the division of responsibilities among these committees has not been determined finally, we understand that the chairman of each committee would serve on the Executive Committee, which would be responsible for overseeing the Council's overall fundraising and advisory activities. The Public Relations Committee would be comprised largely of publicity experts from public relations firms. These advertising experts would develop and run a publicity campaign, which would include television and magazine advertising soliciting contributions to the USIA. Although the responsibilities of the Program Committee have not been finalized, it would probably examine and make recommendations to the Executive Committee on ways to improve the Youth Exchange Programs.

The "members" of the Council, who would apparently number about 270, would not be actively engaged as a group in the direction of the Council, but would be available as a resource to assist in the projects undertaken by the directors. Thus, their contributions, financial and otherwise, would vary from individual to individual. The Council as a group would submit an advisory report to the President and the Director on ways to increase contributions to the USIA, and perhaps also on ways the contributed money should be spent by the USIA. Any final decision on the raising or disbursement of the funds would be made by the Director.

It is contemplated that the proposed Council would be a government entity. Members and directors would be appointed by the Director and would be subject to his control when performing Council activities. This government connection and support is important, we understand, to symbolize the government's commitment to Youth Exchange Programs, to elicit private participation in this effort, and to ensure USIA control over the disposition of contributed funds. Establishment of the Council as a government entity within the USIA would also permit the Council to use the facilities, staff, and funds of the USIA. According to your

543

most recent proposal, however, the directors and members of the Council would not be employees of the federal government as a result of their Council service. Thus, under the current plan, the Council would be composed of 300 corporate executives who would solicit private contributions on behalf of the USIA, would be appointed and supervised by the Director of the USIA, but would not serve as USIA employees.

In the balance of this memorandum, we identify the following four areas in which the USIA's operation of the Council would be subject to certain restrictions: first, the USIA's authority to undertake an advertising campaign to solicit contributions; second, the USIA's authority to expand the size and operations of the Council beyond that which has been proposed; third, the USIA's authority to operate the Council after a year unless it receives specific budgetary support from Congress; and fourth, the USIA's authority to select and supervise members and directors of the Council, and yet not to make them employees of the USIA.[2]

## II. Authority of the USIA to Solicit Contributions to Youth Exchange Programs

We first consider the restrictions on the authority of the USIA to solicit contributions for the USIA's Youth Exchange Programs.

The authority of the USIA to undertake exchange programs is derived from the Fulbright-Hays Act, Pub. L. No. 87–256, 75 Stat. 527, *as amended*, 22 U.S.C. §§ 2451–2459, which was passed in 1961.[3] Section 105 of that Act, 22 U.S.C. § 2455(f), grants the USIA authority to obtain private funding for these exchange efforts. That section states in full:

> Foreign governments, international organizations and private individuals, firms, associations, agencies, and other groups *shall be*

---

[2] Pursuant to conversations with members of your office, we have not examined several other issues raised by the creation of the Council. First, we have assumed that the establishment of the proposed Council would satisfy the requirement of § 5(b) & (c) of FACA, 5 U.S.C. App. § 5(b)&(c) This section generally provides that a new advisory committee should not be established if its functions are or could be performed by one or more agencies or by an advisory committee already in existence, or by enlarging the mandate of an existing advisory committee Second, because we have not been advised as to the specific backgrounds of members and directors of the Council, we have not considered whether their backgrounds would satisfy the requirement in FACA that the committee's membership be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee " 5 U.S.C. App. § 5(b)(2). In this regard, we suggest that you consider whether "points of view" will be balanced if membership is limited to corporate leaders, particularly if the USIA ultimately decides to have the Council advise the Director on the distribution of the funds it collects, rather than simply raising funds and advising on how to raise funds. We are not, of course, expressing any judgment on this issue, but only advising that the subject should be considered. Finally, we have not considered what laws and regulations regarding conflicts of interest would apply to the persons serving on the Council. We note, however, that our conclusion that Council members must be considered government employees, discussed *infra*, necessarily means that some conflicts laws and regulations would apply to the Council members.

[3] The USIA has two authorizing statutes Under the first, the Fulbright-Hays Act, *as amended*, 22 U.S.C. §§ 2451–2459, the USIA is charged with promoting by "grant, contract, or otherwise" "educational" and "cultural" exchanges between the United States and foreign countries. *See* 28 U.S.C. § 2452 These exchanges frequently occur under the auspices of private organizations which receive support through USIA grants, contracts, or other forms of assistance. The proposed Youth Exchange Programs fall within the broad mandate of this Act The USIA also serves, pursuant to the Smith-Mundt Act of 1948, *as amended*, 22 U.S.C §§ 1431–1479 (1976 & Supp. II 1978), as "an information service to disseminate abroad information about the United States, its people, and policies . ." 22 U.S.C. § 1431. *See also* 22 U.S C. §§ 1461, 1461–1 (Supp. II 1978) In discharging this responsibility, the USIA operates the Voice of America, a government radio network which broadcasts to countries abroad. *See* 22 U.S.C. § 1463.

*encouraged to participate to the maximum extent feasible* in carrying out this chapter *and to make contributions* of funds, property and services which the [Director] is authorized to accept, to be utilized to carry out the purposes of this chapter. Funds made available for the purposes of this chapter may be used to contribute toward meeting the expenses of activities carried out through normal private channels, by private means, and through foreign governments and international organizations.

(Emphasis added.)[4] Under this provision, the USIA has clear authority to accept and to use contributions to meet the "expenses of activities carried out through normal private channels, by private means," such as youth exchanges operated by private institutions.[5] A separate question is presented, however, whether and in what manner USIA employees may actively solicit such contributions. By providing that private groups, firms, individuals, and organizations "shall be encouraged to participate to the maximum extent feasible . . . and to make contributions," the section raises two questions: may employees of the USIA generally encourage contributions and, if so, may they do so through a media publicity campaign?

## A. Who May Encourage Contributions

The use of the phrase "shall be encouraged" leaves some ambiguity regarding the precise scope of the USIA's authority because the phrase could arguably constitute only a congressional statement of encouragement for contributions, rather than an authorization for USIA employees actively to solicit contributions.[6] The use of the term "shall be," however, more likely indicates that entities other than Congress, namely the USIA, have authority to encourage private contributions. If Congress had intended this phrase to serve merely as a statement of congressional encouragement, Congress presumably would have used the words "are encouraged," rather than the phrase "shall be encouraged," thereby indicating an understanding that encouragement would take place in the future and by some persons or entities other than Congress itself.

In support of the foregoing interpretation, we note that § 2455(f) is based on an analogous section in the International Cultural Exchange and Trade Fair Participation Act of 1956, Pub. L. No. 860, § 4, 70 Stat. 778, which, according to one of its sponsors "call[ed] for *continued* encouragement of private contributions in support of this program." 102 Cong. Rec. 14103 (remarks of Rep. Thompson) (1956) (emphasis added). Furthermore, § 2455(f) is not written in a

---

[4] When this provision was originally passed, the President was authorized to accept contributions made under this chapter. Reorganization Plan No 2 of 1977, § 7(a)(2), 42 Fed. Reg. 62461, 91 Stat 1637 set out in 22 U.S.C 1461 note, transferred these functions to the Director.

[5] This provision would also give the USIA authority to accept voluntary "services," such as those of the Council's members

[6] Ambiguous language in the two committee reports could be interpreted to provide some support for the view that encouragement was to be provided by Congress rather than the USIA. *See* H Rep No 1094, 87th Cong , 1st Sess. 14 (1961), S. Rep No. 372, 87th Cong., 1st Sess. 16 (1961).

manner which would suggest that Congress was authorizing the USIA simply to accept contributions. By using the phrase "shall be encouraged," Congress seems to have intended that contributions would be an acceptable, indeed desirable, method of augmenting the funds available for the USIA's tasks relative to exchange programs. It seems unlikely that Congress would have enacted this provision if it did not want the USIA to take reasonable steps necessary to make it effective. Thus, the section, in our view, authorizes continued encouragement by the USIA of private contributions, rather than simply announcing Congress' support for private contributions to the USIA's programs.

This interpretation is also consistent with the underlying intent behind the Fulbright-Hays Act to promote close cooperation between the USIA and private entities in undertaking exchange efforts. The USIA is charged generally with "encourag[ing] private institutions in the United States to develop their own exchange activities, and provid[ing] assistance for those exchange activities which are in the broadest national interest." 22 U.S.C. § 1461-1. Since USIA employees are authorized to "encourage" private entities to undertake their own exchange efforts, it is not illogical to conclude that they would also be authorized to solicit private contributions for the USIA's own programs.[7]

## B. Publicity Campaigns

The general language authorizing the "encourage[ment]" of private contributions would also appear to authorize the use of a media campaign by the USIA to raise funds, even though a publicity campaign is not specifically authorized. As we have said, Congress viewed the solicitation of private contributions as an appropriate method for the USIA to fund its operations. A media campaign represents a reasonable technique for undertaking such solicitation on a mass scale.

At the same time, however, we must examine carefully the employment of a promotional campaign or publicity effort because of the requirements of 5 U.S.C. § 3107. That section provides that "[a]ppropriated funds may not be used to pay a publicity expert unless specifically appropriated for that purpose." According to the brief legislative history of § 3107, its purpose is to prevent an agency from employing "publicity" or "press agents" whose business it is to "advertise the work and doings of that department," unless their employment is specifically authorized by Congress. 50 Cong. Rec. 4409 (1913) (remarks of

---

[7] The prohibition in the Smith-Mundt Act on the USIA's dissemination of political propaganda within the United States does not affect this conclusion. The Smith-Mundt Act, 22 U.S C. § 1461, which authorizes the "dissemination abroad, of information about the United States, its people and its policies," specifically prohibits the dissemination of "such information" within the United States. This restriction, however, only applies to "such information," meaning propaganda information disseminated abroad by the USIA pursuant to the Smith-Mundt Act. Cf. 118 Cong. Rec. 19187, 19188 (1972) (remarks of Senators Javits and Fulbright). Neither the language of this provision nor its underlying purpose would restrict the USIA's dissemination within the United States of information on cultural or educational exchanges undertaken pursuant to the Fulbright-Hays Act, 22 U.S.C. § 2455(f). We understand from members of the General Counsel's Office of the USIA that the USIA has traditionally drawn this distinction as the basis for its authority to disseminate information regarding exchange activities, and we agree with this analysis.

Rep. Gillett).[8] Because USIA funds and personnel would necessarily be used, however indirectly, to assist in an advertising campaign run by advertising executives serving on the Council, a question is raised regarding the permissible extent of the USIA's authority to undertake such an effort consistent with § 3107.

In interpreting this provision and an analogous provision discussed below, both this Office and the Comptroller General originally sought to draw a distinction, reflected in the legislative history of the section, between activities that are intended to "give[ ] to the country information as to the work of [a] department," and activities that seek to "extol and exploit the virtues of [a] department." 50 Cong. Rec. 4411 (1913) (remarks of Rep. Lever). Under this view, agencies are authorized to hire employees for their press offices, even without specific statutory or budgetary authority, because these employees are engaged primarily in an informational capacity, and not to extol the virtues of the agency. *See, e.g.,* 31 Comp. Gen. 311 (1952). This Office has conceded at the same time, however, that "[t]he line between information and 'publicity' is almost impossible to draw, since any information about an agency's activities will publicize the agency, and almost all publicity will contain information about the government or about government programs."[9] Similarly, in a book published only last month by the General Accounting Office (GAO), that agency recognizes that this distinction "does not provide adequate guidelines to distinguish the legitimate from the proscribed." Principles of Federal Appropriations Law, 3–148 (1982) (Federal Appropriations Law). *See also* B–194776 (June 4, 1979); B–177704 (February 7, 1973).

Because this is an area in which the line is so difficult to draw, and because the issues are directly pertinent to statutory restrictions on the use of appropriated funds, we believe it is appropriate to accord considerable deference to decisions of the GAO. That agency is charged with enforcing § 3107 and represents the interests of the Congress, whose control of executive activities § 3107 seeks to protect. In Federal Appropriations Law the GAO reviews a series of unpublished Comptroller General opinions on § 3107. After recognizing the difficulty in drawing a line between the legitimate dissemination of information, on the one hand, and "puffing" of agency activities, on the other, the GAO states that it

> does not view 5 U.S.C. § 3107 as prohibiting an agency's legitimate informational functions or legitimate promotional functions where authorized by law. The apparent intent of the statute is to prohibit publicity activity "for the purpose of reflecting credit

---

[8] When introducing this provision, its author explained that it is not "proper for any department of the Government to employ a person simply as a press agent to advertise the work and doings of that department and it is to prevent that in any department that this amendment is offered." He went on to state that such positions for publicity experts "ought not to exist without, as my amendment suggests, a special appropriation by Congress or special recognition and approval by Congress of such an official." 50 Cong. Rec. 4409 (1913) (remarks of Rep. Gillett). *See also id* at 4410 (remarks of Rep. Fitzgerald) ("no service of the Government should employ a man whose duty is to prepare press matter in order to extol or to advertise the work of the service with which he is connected").

[9] Memorandum from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, to Joseph Dolan, Assistant Deputy Attorney General, "Request of House Subcommittee for Interpretation of 5 U S.C. § 54," at 3 (Mar 1, 1963).

> upon an activity, or upon the officials charged with its administra-
> tion, rather than for the purpose of furthering the work which the
> law has imposed upon it."

Federal Appropriations Law at 3–152, quoting A–82332 (Dec. 15, 1936). In the
GAO's view, "the statute is not intended to interfere with the dissemination of
information which an agency is required or authorized by statute to disseminate,
or with promotional activities authorized by law." Federal Appropriations Law, at
3–153; B–139965 (Apr. 16, 1979). *See also* B–181254 (Feb. 28, 1975).[10]

The GAO book gives the same interpretation to a separate but analogous
provision routinely included in the USIA's appropriation statute which prohibits
the use of any agency funds for "publicity or propaganda purposes not authorized
by the Congress." *See* Departments of State, Justice, and Commerce, the
Judiciary, and Related Agencies Appropriation Act, 1980, Pub. L. No. 96–98,
§ 601, 93 Stat. 416, 435 (1979).[11] With respect to this provision, the GAO states
that it is "reluctant to find a violation where the agency can provide a reasonable
justification for its activities." Federal Appropriations Law, at 3–148. *See also*
B–184648 (Dec. 3, 1975); B–178528 (July 27, 1973). The GAO cites with
approval a Comptroller General opinion which upheld the authority of the
Department of Commerce to undertake a "national multi-media campaign to
enhance public understanding of the American economic system." Federal
Appropriations Law, at 3–149. In the GAO's view, this campaign was a reason-
able means of discharging the Department of Commerce's function of promoting
commerce and did not "aggrandize" the Commerce Department. *See* B–184648
(Dec. 3, 1975). The GAO book cites only two cases in which the Comptroller
General has found an activity prohibited because of the ban on unauthorized
publicity. In the first case, the Comptroller General held that a speech by the
Deputy Assistant Secretary of Defense apparently seeking public assistance in
lobbying for Defense programs was impermissible. *See* B–136762 (Aug. 18,
1958). In the second case, which predated the appropriation statute, the Comp-
troller General found that attempts by the Federal Housing Administration (FHA)
to promote homeowner improvements were prohibited. The opinion reasoned
that the creation of demand for housing was not an authorized purpose of the
FHA. *See* 14 Comp. Gen. 638 (1935).

In light of the extremely narrow interpretation given to these provisions in the
Comptroller General opinions, we believe that the Comptroller General would
uphold the limited use of appropriated funds to support a reasonable and carefully
controlled advertising campaign by the Council. Like the Departments of Energy
and Commerce, the USIA has specific authority to promote an activity in the
private sector—namely, the making of contributions of funds, property, and

---

[10] For this proposition, the GAO relies on two Comptroller General opinions. These decisions approved a Federal
Energy Administration (FEA) advertising campaign to conserve energy on the ground that the FEA had the authority
to promote energy conservation. *See* B–139965 (Apr. 16, 1979); B–181254 (Feb. 28, 1975).

[11] This section states in full:
> No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes
> not authorized by the Congress

services for youth exchange programs. A media campaign represents an effective method for reaching the public and conveying the need, as in the FEA case cited in footnote 10, to conserve energy or, in this case, to support exchange programs. We would caution, however, that the proposed USIA advertising campaign should be carefully tailored and scrutinized so that it does not unduly emphasize the accomplishments of the USIA or aggrandize the agency or its officials. Possibly in contrast with the advertising campaigns previously sanctioned by the Comptroller General and cited in the GAO report, the proposed advertising campaign soliciting contributions to the USIA would undoubtedly involve some degree of favorable comment on the programs of the USIA, albeit with the purpose of promoting an activity which the USIA is generally authorized to promote— the donation of funds. For this reason, we believe that the advertising campaign should focus primarily on the private youth exchange activities, and not place any undue emphasis on the officials or operations of the USIA itself. With this caveat, we conclude that a reasonable media campaign would be approved by the Comptroller General in these unique circumstances.

### III. Authority to Establish a Council to Solicit Contributions

A second legal issue arises from the USIA's plan to solicit contributions by creating a new council staffed by persons who would be part-time volunteers of the USIA. Section 673 of Title 31 (1976) states:

> No part of the public moneys, or of any appropriation made by Congress, shall be used for the payment of compensation or expenses of any commission, council, board, or other similar body, or any members thereof, or for expenses in connection with any work or the results of any work or action of any commission, council, board, or other similar body, unless the creation of the same shall be or shall have been authorized by law. . . .

Under this section, the use of any money for the expenses of any council is prohibited "unless the [council] shall have been authorized by law." Thus, while solicitation of contributions by USIA employees may be authorized, creation of the Council itself must be "authorized by law" within the meaning of this section in order for public funds to be used for its expenses or for USIA employees to assist it in its operations.

The requirements of this section have never been clearly articulated, although this section apparently does not require specific authorization for the establishment of committees. Immediately following its passage, the Attorney General in a 1909 opinion concluded that authority for the creation of a council "would be sufficient if their appointment were authorized in a general way by law." 27 Op. Att'y Gen. 432, 437 (1909). The Comptroller General adopted a similar position that a council is authorized if its "duties or functions can be performed only by

such a group or if it is generally accepted that such duties can be performed best by such a group." 40 Comp. Gen. 478, 479 (1961).[12]

Even though § 673 would not require specific statutory authorization for the creation of the Council, a question remains whether the Council will be "authorized in a general way by law." No clear legal lines can be drawn in this area, especially before the Council has begun operations. We believe that, as presently planned, the Council would be authorized in light of Congress' preference for private funding of USIA programs and close cooperation between the USIA and private organizations. In our view, however, the larger the Council and the more diverse its functions and structure become, the greater the risk that Congress or a court could determine that it is not "authorized in a general way by law." We leave it to the judgment of the General Counsel's Office of the USIA to determine at what point it believes the size and operation of the Council may exceed prudent bounds.

## IV. Congressional Appropriations

A third limitation on the operation of the Council is the requirement that it obtain specific congressional funding for its expenses after the first year of its operation. Section 696 of Title 31 requires that no money may be spent for any "agency or instrumentality" after it has been in existence for more than one year "if the Congress has not appropriated any money *specifically* for such agency or instrumentality or *specifically* authorized the expenditure of funds by it." (Emphasis added.)[13] The purpose of this provision, commonly referred to as the Russell Amendment after its author, Senator Richard Russell, is "to retain in the Congress the power of legislating and creating bureaus and departments of the Government." 90 Cong. Rec. 3059 (1944) (remarks of Sen. Russell). Before

---

[12] The passage of the so-called Russell Amendment, 31 U.S.C. § 696, provides further support for the view that § 673 does not require specific statutory authorization for the creation of a committee. Section 696 requires, as we discuss in detail *infra*, that no money may be spent for an "agency or instrumentality" after it has been in existence for more than one year "if the Congress has not appropriated any money specifically for such agency or instrumentality or specifically authorized the expenditure of funds by it." The purpose of this provision was to assure congressional control over various government commissions that had come into existence over the years without statutory authorization. *See generally* 90 Cong. Rec. 3059, 3060, 3064 (1944) (remarks of Sen. Russell). By introducing this enforcement mechanism, Congress may have implicitly recognized that the Executive Branch has some discretion to create commissions, at least for a year, without clear statutory authorization.

[13] Section 696 states in full:

After January 1, 1945, no part of any appropriation or fund made available by this or any other Act shall be allotted or made available to, or used to pay the expenses of, any agency or instrumentality including those established by Executive order after such agency or instrumentality has been in existence for more than one year, if the Congress has not appropriated any money specifically for such agency or instrumentality or specifically authorized the expenditure of funds by it. For the purposes of this section, any agency or instrumentality including those established by Executive order shall be deemed to have been in existence during the existence of any other agency or instrumentality, established, by a prior Executive order, if the principal functions of both of such agencies or instrumentalities are substantially the same or similar When any agency or instrumentality is or has been prevented from using appropriations by reason of this section, no part of any appropriation or fund made available by this or any other Act shall be used to pay the expenses of the performance by any other agency or instrumentality of functions which are substantially the same as or similar to the principal functions of the agency or instrumentality so prevented from using appropriations, unless the Congress has specifically authorized the expenditure of funds for performing such functions.

550

passage of this section, members of Congress had expressed concern over the establishment of various government councils and commissions without specific statutory authority. Section 696 sought to make these entities accountable to Congress by requiring that they receive specific budgetary support within a year of their establishment. *See* 90 Cong. Rec. 3059, 3060, 3064 (1944) (remarks of Sen. Russell).

This Office has previously interpreted this section narrowly. In our view, it does not apply to "entities that exist by virtue of statutory authority."[14] Thus, we have found that "purely advisory committees" do not need to obtain specific budgetary approval because they are established under the Federal Advisory Committee Act (FACA). We have also found that the term "agency or instrumentality," as used within this section, covers only entities that are invested "with actual authority to take substantive action on [an official's] or the government's behalf."[15] Thus, "purely advisory committees" would also not be covered by this section because they take no "substantive action."

Even under this narrow interpretation, however, the proposed Council for International Youth Exchange would be subject to the requirements of 31 U.S.C. § 696. First, as a committee performing both advisory and operational functions, the Council is not specifically authorized by any statute since FACA specifically authorizes the creation of committees which are only advisory. Second, even assuming that the Council would have sufficient revenues of its own to cover operational expenses, it would nevertheless rely on appropriated funds to support its activities because, as we understand it, it would both require the assistance of USIA personnel and the use of USIA facilities. The cost of these USIA personnel and expenses would be covered by appropriated funds, whose use would be unauthorized after one year unless the Council received specific congressional appropriations.[16] Finally, the Council would be an "agency or instrumentality" within the meaning of 31 U.S.C. § 696 because, as contemplated, it would discharge responsibilities vested by law in the USIA and would not be purely advisory. Although this office has interpreted the term "agency or instrumentality" to cover only entities that take substantive action, we have nonetheless indicated that an entity that "acts on behalf of the government or exerts any governmental power," such as a commission, should be covered.[17] Section 696 was specifically passed to regulate the establishment of government councils and

---

[14] *See* memorandum from Mary C. Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, to Robert J. Lipshutz, Counsel to the President, "Application of Russell Amendment to Purely Advisory Committees," at 6 (June 27, 1979) (Lawton Memorandum).

[15] Lawton Memorandum, p. 3.

[16] Even if the Council could operate without government assistance after the first year, a question would remain whether the existence of a council operating on contributed funds contravenes the underlying intent of § 696 Section 696 was passed in order to permit Congress to control through the budgetary process the operation of government instrumentalities that exercise governmental power. *See* 90 Cong Rec 3059, 3060, 3064 (1944) (remarks of Sen. Russell) Creating and operating "instrumentalities" that perform government functions, but rely on contributed funds, might be said to contravene that intent. *But cf.* 90 Cong. Rec. 3067 (remarks of Sen Danaher) (arguing that borrowing by government corporation should not be an appropriation within this provision) We have not attempted to resolve this question because we have been informed that the use of USIA facilities, staff, and funds is contemplated.

[17] Lawton Memorandum, p 5.

commissions, at least if they perform non-advisory functions. *See* 90 Cong. Rec. 3059 (1944) (remarks of Sen. Russell). Thus, the Council, which would take substantive action—fundraising—on behalf of the USIA, would be an "instrumentality" using appropriated funds. Accordingly, we believe that it would be subject to the requirement of § 696 that it obtain specific congressional appropriations within a year of its creation in order for it to continue beyond that date.[18]

## V. Employee Status of Council Members and Directors

The final problem raised by the establishment of the Council relates to the fact that the USIA apparently does not wish the Council's directors and members to be employees of the USIA within the meaning of the civil service laws. *See* 5 U.S.C. § 2105. Section 2105, Title 5, defines an employee within the meaning of that Title as a person who is (1) appointed by a federal officer or employee, (2) engaged in the performance of a federal function under law, *and* (3) subject to the supervision of a federal officer or employee. As we understand the proposed functions of the Council, both the director and members would necessarily be employees within the meaning of this provision.[19]

First, they would all be appointed to the Council by the Director of the USIA. This appointment is necessary, we understand, to elicit private participation in the project, to symbolize the government's commitment to Youth Exchange Programs, and to exercise USIA control over the Council. Indeed, even if the USIA did not wish to "appoint" members and directors to the Council, the regulations of the Office of Personnel Management would require that they be appointed by the government if they are to assume their proposed responsibilities. According to the Federal Personnel Manual, Chapter 735, App. C, "Conflicts of Interest Statutes and Their Effects on Special Government Employees," (FPM, App. C), when a person is serving on a government advisory committee, board, or other group in an independent capacity, rather than presenting the views or interests of a particular organization, he must be formally appointed. *See generally* Memorandum from J. Jackson Walter, Director, Office of Government Ethics, to Heads of Departments and Agencies of the Executive Branch, "Members of Federal Advisory Committees and the Conflict-of-Interest Statutes," p. 6 (July 9, 1982) (Walter Memorandum). The members and directors of the Council would not be "invited to appear at an agency in a representative capacity," but rather to render independent advice and to solicit contributions in the name of the agency. Accordingly, they would have to be formally appointed.

Second, the directors and members of the Council would be engaged in the performance of a federal function. In their advisory capacity, these individuals,

---

[18] Section 691, Title 31, provides an exemption from the funding requirement of § 696 for "interagency groups engaged in authorized activities of common interest to such departments and establishments and composed in whole or in part of representatives thereof." As the language of § 691 indicates, however, it only exempts committees which are established to coordinate common activities between more than one agency. Thus, it would not exempt the Council, which is organized only to further the exchange activities of the USIA, from the obligation to obtain funding within one year of its creation.

[19] We have assumed that the members of the Council would be actively engaged in assisting the Council.

as we have said, would be rendering independent advice to the USIA. *See generally* Walter Memorandum, pp. 6–7. In their operational capacity, they would be soliciting for and in the name of the USIA. *See* FPM, App. C–5 ("When an advisor or consultant is in a position to act as a spokesman for the United States or a Government agency as, for example, in an international conference—he is obviously acting as an officer or employee of the Government").

Third, the members and directors of the Council would be subject to the supervision of a federal officer or employee. Whether an individual is independent or supervised depends on "the detail with which the party for whom the work is eventually produced actually supervises the manner and means by which the work is performed." *Lodge 1858, AFGE v. Webb*, 580 F.2d 496, 504 (D.C. Cir.), *cert. denied*, 439 U.S. 927 (1978). According to your proposal, the USIA would exercise control over the manner of solicitation, the content and targets of the solicitation, the individuals who would be doing the solicitation, and the manner in which the money so raised would be expended. The Agency also plans to provide staff and offices for the Council, which is generally inconsistent with an independent relationship between the Agency and the Council. Moreover, officials of the USIA have been and wish to continue to be actively involved in the creation of the Council. Finally, officials of the USIA do not plan to enter into a contract with the Council for fundraising, which is generally one indication of an independent relationship.[20] Accordingly, in our view, the activities of the directors and members of the Council, as you have described them, would require that they be employees of the federal government within the meaning of Title 5.[21]

## VI. Conclusion

This memorandum has outlined the various legal questions raised by the creation of the proposed Council by the USIA. In our view, the USIA may establish the Council in the manner you have proposed so long as its members and directors are employees of the USIA, and any publicity effort the Council undertakes is carefully tailored to further only the fundraising goals of the USIA, and not unduly to publicize the USIA.[22] We also caution that the larger the size of the Council, and the more diverse its functions, the greater the risk that it could stray beyond the limits of the "authorized in a general way by law" exception to § 673. Because no bright line can be drawn under this statute, we leave it to your

---

[20] An approach involving a contract between the USIA and the Council for fundraising would raise questions as to whether the USIA has the authority to enter into a contract for fundraising, and whether such a contract with the Council would satisfy the procurement laws. We have not examined these issues, since the current proposal does not contemplate such an approach. In any event, we would generally defer to the initial judgment of your office on questions such as these relating to the authority of the USIA.

[21] As you know, the members and directors of the Council could either be regular government employees or special government employees, depending upon the length and terms of their service. *See* FPM, App. C.

[22] Although we have not specifically considered what conflicts of interest laws and regulations would apply to the solicitation of funds by the Council, our conclusion that Council directors and members must be considered government employees necessarily means that certain conflicts of interest restrictions would apply. More generally, because of the unusual functions of the Council, we recommend that the USIA exercise particular care in the solicitation of contributions to ensure that no improper pressure is placed on members of the public to contribute, and that no conflicts of interest would arise in the course of this solicitation.

informed judgment to decide whether the proposed Council remains, in its current form, within prudent bounds.[23]

If you should like our advice on any more specific aspects of the proposed Council, please feel free to contact us.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[23] You have raised two other questions about the operation of the Council, neither of which, in our opinion, raises a legal problem. First, you have asked whether the President can direct through memorandum rather than executive order that the Council engage in both operational and advisory functions. FACA states that an advisory committee shall be solely advisory unless specifically provided otherwise by statute or "Presidential directive." 5 U.S.C. App. § 9(b) We believe an executive memorandum is all that is required to satisfy the requirement of a presidential directive. *See* Office of Management and Budget Circular A–63, 38 Fed. Reg. 2306, 2308 (1973).

Second, you have asked whether the members and directors of the Council may be appointed by the Director, although the President would recommend their appointment to the Director. We see no legal problem with the director of an agency appointing the members of a committee which advises both him and the President, at least where the President recommends their appointment.